# EXHIBIT D

## Civil Action No. 1:23-cv-1466

# Tesla, Inc. Master Services Agreement

This Master Services Agreement ("***MSA***") is entered into by and between Tesla, Inc., a Delaware corporation with offices at 3500 Deer Creek Road, Palo Alto, California, 94304 ("***Tesla***") and the service provider identified below ("***Supplier***") effective as of the date signed below by Tesla and govern Supplier's performance, and Tesla's purchase, of services.

## 1. THE SERVICES

**1.1** <u>Authorization of Services</u>.  The "***Services***" are the following, as they may be supplemented, modified or replaced during the Term: (a) the functions described in an Agreement as functions for which Supplier is responsible; and (b) any functions related to the foregoing that are not specifically described in an Agreement but are required for the provision of the Services thereunder.  Supplier shall provide, and Tesla and/or its Affiliates may purchase, Services pursuant to an Approved Work Order using the form attached hereto as <u>Schedule A</u>.  Supplier shall not perform any Services until Tesla and/or its Affiliate issues a Purchase Order which incorporates the terms of the applicable Approved Work Order.  Upon Supplier's acceptance of such Purchase Order, the terms of the applicable Approved Work Order, together with the terms in the other Agreement Documents, will become a binding agreement (an "***Agreement***") between Supplier and Tesla and/or its Affiliate.

**1.2** <u>Obligation to Provide the Services, Generally</u>.  Starting on the Effective Date, or any later date that may be specified in writing for any specific Services, and continuing during the Term, Supplier will perform the Services in accordance with the terms of the Agreement.  The Services may be received by Tesla, any of Tesla's Affiliates, and any third party supplier or business partner of Tesla (each, a "***Service Recipient***").

**1.3** <u>Services Not Exclusive</u>.  Supplier is a non-exclusive provider of Services.  Tesla and its Affiliates have no obligation to order or purchase any Services.  The extent and quantity of Services purchased shall be determined by Tesla.  Tesla may purchase from any third party services that are identical or similar to the Services described in the Agreement.  Supplier will cooperate and coordinate with Tesla or any other service providers selected by Tesla as reasonably required for Tesla or the service provider to perform services for which it is responsible.

**1.4** <u>Relationship of the Parties</u>.  Supplier is an independent contractor and is not an agent, servant, employee, legal representative, partner or joint venturer of Tesla or any Affiliate of Tesla.  Nothing in this MSA or any Agreement shall be deemed to create a joint venture or partnership between Supplier and Tesla or any of Tesla's Affiliates.  Supplier has the sole right and obligation to supervise, manage, and direct all work to be performed by Supplier Personnel under the Agreement.  Supplier has no authority to represent or bind Tesla.

## 2. PERFORMANCE

**2.1** <u>Time of Performance</u>.  Supplier will complete all Services diligently, in a timely manner, and in accordance with the time schedules set forth in the Agreement.  Time is of the essence with respect to the provision of Services.  Supplier will promptly notify Tesla in writing upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely completion of any Services.  Supplier will use Commercially Reasonable Efforts to avoid or minimize any delays in performance and will inform Tesla of (a) the steps Supplier is taking or will take to do so and (b) the projected completion time.

**2.2** <u>Manner of Performance</u>.  Supplier will perform the Services at the Tesla Facilities listed or described in the Agreement.  Supplier will manage and successfully perform, complete and deliver the Services in accordance with the Agreement.  In cases where the Agreement does not prescribe or otherwise regulate the manner of Supplier's performance of the Services, Supplier will render the Services in accordance with Supplier's prevailing practices, which will not be less favorable to Tesla than the established best practices followed by the leading providers of similar services.

**2.3** <u>Responsibility for Supplying Certain Resources</u>.  The Agreement will define each Party's responsibility (including financial responsibility) for providing equipment, facilities, third-party services and other resources expected to be required for the Services.  If Tesla has financial responsibility for any resource that is acquired by Supplier on Tesla's behalf under an Agreement, Supplier will obtain Tesla's prior written approval of the terms on which the resource is to be acquired, including the terms of any associated contract.

**2.4** <u>Performance Criteria</u>.  Supplier's performance of the Services will be measured as specified in the Agreement.  The Charges may be subject to adjustment based on the assessment of its performance to the extent provided in the Agreement.

**2.5** Acceptance Tests. If and to the extent set forth in the Agreement, the Services will be subject to acceptance tests which are reasonably specified by Tesla and/or mutually agreed in writing by the Parties.  Supplier will notify Tesla in writing when it believes the Services are ready for acceptance testing and shall assist Tesla in performing such tests.  Tesla shall determine whether the Services have passed the applicable acceptance tests and notify Supplier of its determination.  If Tesla determines that the Services have not passed the acceptance tests, Supplier shall have fifteen (15) days (or such longer period as the Parties may agree) to resubmit such Services for acceptance testing.  Tesla shall not be liable, and Supplier shall not invoice Tesla, for any Services which have not passed the applicable acceptance tests.

**2.6** Reporting. If required by Tesla, on or before the fifteenth (15th) day of each month during the Term, Supplier shall provide a written progress report detailing (a) Supplier's activities and performance against any Service Levels in the preceding month, (b) progress towards milestones, and (c) any actual or anticipated delays that might affect completion of Services in accordance with the applicable project plan or timeline under the Agreement.

**2.7** Compliance with Laws and Tesla Policies.

(a) Supplier will, at its cost and expense, obtain all necessary regulatory approvals, licenses, and permits (collectively, "***Permits***") applicable to its business and comply with all Laws applicable to its business or the performance of its obligations under each Agreement, as such Laws may be revised from time to time.  Supplier shall provide copies of any such Permits at Tesla's request.  To the extent Supplier (or any of its subcontractors) makes payments to any government official or any other person under an Agreement on behalf of Tesla, Supplier will maintain true, accurate and complete books and records concerning any such payments, including the purpose of each transaction.

(b) Supplier will comply with, and perform the Services in compliance with, all Laws pertaining to: (i) occupational safety and health; (ii) protection of persons and property from death, injury or damage; (iii) the environment and the use, handling, storage, labeling and disposal of toxic or hazardous materials; (iv) labor and employment, including equal employment opportunity; (v) tax; (vi) workmen's compensation and unemployment insurance, (vii) money laundering, anti-terrorism, trade embargos, and economic sanctions; and (viii) to the extent relevant to Supplier's performance of Services, Laws with respect to (a) data privacy, data protection, and consumer privacy and (b) anti-bribery and anti-corruption.

(c) To the extent not prohibited by Law, Supplier will promptly notify Tesla in writing of any investigation or inquiry into whether Supplier (or any of its subcontractors) is charged with failing to comply with any Laws that may or will impact, or are otherwise applicable to, Supplier's performance under an Agreement.

(d) Supplier will comply with any Tesla policies, standards, rules, and procedures (collectively, "***Tesla Policies***") applicable to performance of the Services or the Tesla Facility that are disclosed to Supplier in writing, as such Tesla Policies may be revised from time to time.

**2.8** Suspension of Performance. Tesla may, at any time, direct Supplier to suspend all or any part of the work for not more than 180 days.  In the event of a suspension, Tesla may, in its sole discretion, reimburse Supplier for reasonable and actual additional costs incurred solely and directly as a result of the suspension, provided that a detailed claim with supporting documentation of such costs is submitted to Tesla within 30 days after the end of the suspension.  Supplier agrees to provide Tesla a good faith estimate of its suspension costs upon request.

**2.9** Corrective Action. With reference to Section 2.4 (Performance Criteria), if Supplier fails to meet one or more performance criteria with respect to the Services, Supplier will: (i) promptly investigate and report on the root cause of the problem; (ii) remedy the cause of the failure and resume meeting the affected performance criteria; (iii) implement and notify Tesla of measures taken by Supplier to prevent recurrences if the failure is otherwise likely to recur; and (iv) make written recommendations to Tesla for improvements in procedures.

**3.** **SUPPLIER PERSONNEL AND SUBCONTRACTING**

**3.1** General Requirements for Supplier Personnel.

(a) Supplier will assign an adequate number of Supplier Personnel to perform the Services who are properly educated, trained, familiar with and fully qualified for the Services they are assigned to perform (including, without limitation, licensed in the relevant regions to provide work that requires a license).  Supplier will assign sufficient supervisory personnel to provide adequate liaison with Tesla.  Supplier will manage, supervise and provide direction to Supplier Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Agreement.  Supplier is responsible for the acts and omissions of Supplier Personnel under or relating to each

Agreement.  Supplier is responsible for validating the identity of and ensuring that Supplier Personnel assigned to perform Services (i) have the legal right to work in the country(ies) in which they are assigned to work, and (ii) conform to all applicable Tesla Policies with respect to personal and professional conduct (including the wearing of an identification badge and adhering to general safety, dress, behavior, and security practices).

(b)        Prior to assigning any Supplier Personnel to perform any Services, Supplier shall perform background checks of the personnel.  Such background checks may have been performed as part of Supplier's standard pre-employment screening process and will, to the extent permitted by applicable Law, include the following:  (i) education verification; (ii) prior employment verification for all employees; (iii) social security verification; and (iv) felony and misdemeanor criminal checks.  Tesla may require Supplier to provide written evidence of successful background checks on Supplier Personnel at any time.  Unless prohibited by law, Supplier may not assign any person to perform Services for Tesla who was convicted of a crime without Tesla's prior written consent.

**3.2**      Key Supplier Positions.  "***Key Supplier Positions***" means those positions designated as such in the applicable Agreement.  Supplier will cause each of the Supplier Personnel filling the Key Supplier Positions to devote substantially full time and effort to the provision of the Services during the period of assignment.  The appointment, removal and replacement of any person to a Key Supplier Position may only be made with Tesla's prior written approval, which will not be unreasonably withheld.

**3.3**      Approval and Removal of Supplier Personnel.  Tesla may approve all Supplier Personnel assigned to perform Services that are charged on a time and materials basis.  Tesla may require Supplier to replace any Supplier Personnel whose performance, in Tesla's reasonable judgment, has been unsatisfactory.  Supplier will be liable for any expenses associated with the replacement of any Supplier Personnel under this Section.

**3.4**      Subcontracting.

(a)        Subject to Section 3.4(b), Supplier may not subcontract or delegate the performance of any part of the Services without Tesla's prior written consent, which Tesla may withhold in its sole discretion.  If Tesla approves a subcontractor that is an Affiliate of Supplier, such approval is subject to the subcontractor remaining an Affiliate of Supplier.  Tesla may require Supplier to replace any previously approved subcontractor whose performance, in the reasonable judgment of Tesla, has been unacceptable.  Supplier is responsible for managing all subcontractors and is responsible for all subcontractors to the same extent as if the subcontracted Services were retained by Supplier.  Supplier will be Tesla's sole point of contact regarding the Services and all subcontracted Services, including for payment.  Supplier shall include in subcontracts any provisions of the Agreement that may be applicable to performance of the subcontract and all other provisions intended for the protection of Tesla.

(b)        Supplier may, in the ordinary course of business, utilize third party services or products that are not dedicated to performance of Services for Tesla and that are not material to any particular function constituting a part of the Services.  Supplier may also engage individual independent contractors to supplement its employee workforce.  Such arrangements do not constitute Subcontracting for the purposes of this Section.  Supplier will nevertheless be responsible for such parties.

**4.      CHARGES**

**4.1**      Charges, Generally.  The Agreement sets forth (or will set forth) the unit rates and charges payable to Supplier for performing the Services and the associated invoicing and payment procedures and terms thereunder (collectively, the "***Charges***").  Tesla will not be required to pay Supplier any amounts under an Agreement other than the Charges payable to Supplier under, and calculated in accordance with, the Agreement.

**4.2**      Invoicing.

(a)        Supplier shall submit invoices to the Tesla entity which entered into the Agreement on a monthly basis in accordance with the method of electronic communication specified by such Tesla entity.  All invoices must reference the Agreement/release number (where applicable), contain an itemization of amounts for Services rendered during the applicable invoice period (including, if applicable and requested by Tesla, a separate break-down of charges for goods and services used by Supplier in performance of the Services, and detailed time card entries with respect to Services that are charged on a time & materials basis), and must comply with the provisions of the Agreement and such other reasonable requirements as may be prescribed by Tesla and/or its Affiliate from time to time. All invoices and payments will be in local currency of the country in which the Service Recipients receive the Services.

(b)        Payment of Supplier's invoices shall be due within 60 days of receipt of each invoice by Tesla or its Affiliate; provided, however, that (i) Tesla or its Affiliate may withhold payment of any invoiced charges that Tesla disputes in

good faith; (ii) payment of any Charges shall not be deemed an approval of such Charges, and Tesla may later dispute such Charges; and (iii) payment of Charges shall not relieve Supplier of any of its warranties or other obligations under the Agreement.  The Parties shall work in good faith to resolve any disputed Charges.

(c)  If Supplier owes Tesla a credit or other amount under the Agreement (e.g., for delay or failure to achieve a milestone), Supplier will pay that amount by check or wire transfer within 45 days.

(d)  Charges, if any, that Supplier fails to invoice to Tesla within 120 days of the date that such Charges should have been billed to Tesla will not be payable by Tesla.  In the case of third party charges for which Tesla is responsible for paying or reimbursing Supplier, the 120-day period will not begin to run until Supplier has been invoiced for such charges by the applicable third party.

**4.3**  Incidental and Out-of-Pocket Expenses.

(a)  Unless expressly provided otherwise in an Agreement, Tesla is not responsible for any additional costs or expenses of any nature incurred by Supplier in connection with the provisions of the Services, including travel expenses, clerical or administrative personnel, long distance telephone charges, etc. ("***Incidental Expenses***").  To the extent that an Agreement requires Tesla to reimburse Supplier for Incidental Expenses, Tesla is not responsible for any such reimbursement unless the expenses are (i) approved in writing, in each instance, in advance by Tesla; (ii) substantiated by appropriate receipts and related documentation; and (iii) in compliance with Tesla's corporate travel policies and procedures, as amended from time to time in Tesla's sole discretion.  In no event will Tesla be liable for payment of any Incidental Expenses that exceed Supplier's total fees under an Agreement by 10% or more.

(b)  "***Out-of-Pocket Supply Expenses***" are the reasonable, demonstrable and actual out-of-pocket expenses incurred by Supplier for equipment, materials, or supplies required for performance of the Services and specified in writing by Tesla as reimbursable, and "***Out-of-Pocket Service Expenses***" are the reasonable, demonstrable and actual out-of-pocket expenses incurred by Supplier for services (such as with tier 2 service providers) required for performance of the Services and specified in writing by Tesla as reimbursable ("***Out-of-Pocket Expenses***" refers collectively to Out-of-Pocket Supply Expenses and Out-of-Pocket Service Expenses).  Out-of-Pocket Expenses are to be determined net of all rebates, discounts and allowances received by Supplier, and shall not include Supplier's actual or allocated overhead costs, administrative expenses or other mark-ups.

**4.4**  Taxes.

(a)  This Section 4.4 sets forth the allocation of responsibility between the Parties for taxes arising out of or in relation to an Agreement.  Except as otherwise expressly provided in this Section 4.4, each Party remains solely responsible for taxes imposed or assessed on such Party and its Affiliates (or their activities), including taxes assessed on such Party's and its Affiliates' (i) property, franchise, income, and business and occupational taxes (or similar in nature) on its business activities, and (ii) for employer-related taxes with respect to its personnel (e.g. employee taxes, workers compensation and unemployment insurance).  Each Party agrees to reasonably cooperate with the other to enable each to more accurately determine its own tax liability and to minimize such liability to the extent legally permissible.

(b)  The only taxes for which Tesla will be responsible for paying Supplier are the Service-Related Taxes applicable to the Services under an Agreement.  Any Service-Related Tax Supplier is responsible for collecting from Tesla and paying to the applicable tax authority will be paid by Tesla on a pass-through expense basis (i.e., at Supplier's actual direct cost, without any uplift or other mark-up).  If Tesla is exempt from any Service-Related Tax, it will provide Supplier with a copy of the applicable tax exemption certificate, and Supplier will not bill, charge, or credit Tesla for such tax.

(c)  Supplier's invoices shall: (i) include any Service-Related Taxes; (ii) include a breakout between taxable and non-taxable Charges; and (iii) show the tax rate, the value against which the tax rate is applied, and the total amount of tax due. All invoices must comply with local invoice requirements. If Supplier is responsible for failing to invoice Tesla for applicable Service-Related Taxes or failing to pay such taxes to the applicable taxing authorities in a timely manner, Supplier will have financial responsibility for the uncharged or unpaid Service-Related Taxes and any associated penalties and interest.

(d)  Withholding Taxes.  If laws, rules or regulations require the withholding of income taxes or other taxes imposed upon payments set forth in this Section 4, Tesla shall make such withholding payments as required and subtract such withholding payments from the payments.  Tesla shall submit appropriate proof of payment of the withholding taxes to the Supplier within a reasonable period of time.  At the request of Supplier, Tesla shall give Supplier such reasonable assistance, which shall include the provision of appropriate certificates of such deductions

made together with other supporting documentation as may be required by the relevant tax authority, to enable Supplier to claim exemption from such withholding or other tax imposed or obtain a repayment thereof or reduction thereof and shall upon request provide such additional documentation from time to time as is reasonably required to confirm the payment of tax.

**5. TESLA RESPONSIBILITIES**

**5.1** Tesla Responsibilities, Generally. To facilitate Supplier's performance of the Services, Tesla will, at its own cost and expense, perform those tasks and fulfill those responsibilities of Tesla as set forth in the Agreement ("***Tesla Responsibilities***"). Supplier's performance of the Services may be dependent in some circumstances on Tesla's timely and effective performance of the Tesla Responsibilities and timely decisions and approvals by Tesla.

**5.2** Savings Clause. Tesla's failure to perform any of the Tesla Responsibilities (or cause them to be performed) will not constitute grounds for termination by Supplier except as provided in Section 8.4 (Termination by Supplier); provided, however, that Supplier's nonperformance of its obligations under an Agreement will be excused if and to the extent (i) such nonperformance results from Tesla's failure to perform any Tesla Responsibilities, and (ii) Supplier provides Tesla with reasonable notice of such nonperformance and, if requested by Tesla, uses Commercially Reasonable Efforts to perform notwithstanding Tesla's failure to perform. If Supplier's use of Commercially Reasonable Efforts to perform in such a circumstance would cause Supplier to incur significant uncompensated expenses, Supplier may notify Tesla. In that case, Supplier's obligation to continue its efforts to work around Tesla's failure to perform will be subject to Tesla agreeing to reimburse Supplier for its incremental uncompensated expenses.

**5.3** Access to Tesla Systems and Facilities.

(a) From time to time and at Tesla's sole discretion, Tesla may provide Supplier with access to proprietary computer systems and technologies owned and operated by Tesla and/or its affiliates to facilitate the Services (the "***Systems***"). Supplier will only use the Systems for the business purposes of Tesla. Tesla may periodically monitor all uses of the Systems as allowed by law and review user access records maintained by Supplier. Supplier's users will have no expectation of privacy when using the Systems. Supplier shall be solely responsible for obtaining and maintaining the hardware and software it uses which are necessary to properly access the Systems and perform the Services.

(b) Tesla will provide to Supplier Personnel assigned to work at a Tesla Facility the reasonable use of the facility. The access to and use of Tesla Facilities granted hereunder does not constitute a leasehold, usufruct, or other property interest in favor of Supplier. Tesla retains all of its right, title and interest in and to the Tesla Facility. Supplier will use the Tesla Facility for the sole purpose of providing the Services. Supplier will be responsible for any damage to the Tesla Facility caused by Supplier Personnel. Supplier will permit Tesla and its agents and representatives to enter into those portions of Tesla Facility that are occupied by Supplier Personnel at any time and, when those portions of the Tesla Facility are no longer required for performance of the Services, Supplier will return them to Tesla in substantially the same condition as they were in when Supplier began use of them, subject to reasonable wear and tear.

**6. CONFIDENTIALITY**

**6.1** Confidentiality. Tesla's mutual non-disclosure agreement as of the Effective Date or, if applicable, the signed non-disclosure agreement then in effect between the Parties ("***NDA***") sets forth the Parties' respective confidentiality obligations hereunder. The NDA is hereby incorporated by reference in this MSA, and the terms and conditions of the NDA will continue in force throughout the duration of this MSA. Tesla's Confidential Information is deemed to include information relating to the research and development of products, including application and usage, methods of manufacture, methods of design, trade secrets, business plans, including current and future implementation plans or plans regarding forecasts and product roadmaps, future orders for product including specifications, quantities and timing, customers, finances and personnel data related to the business or affairs of Tesla, the existence of any relationship or business dealings between Tesla and Supplier, the existence and terms of the MSA and each Agreement, and all Intellectual Property Rights owned or separately licensed by Tesla.

**6.2** Data Security. Supplier will: (i) establish, implement and maintain commercially reasonable safeguards against the destruction, loss, alteration and unauthorized access and use of Tesla Data in the possession or control of Supplier (or its Subcontractors) that are no less rigorous than those maintained by Tesla as of the Effective Date and are no less rigorous than those maintained by Supplier for its own data of a similar nature; and (ii) comply with Tesla's information and data security policies as disclosed to Supplier from time to time. No later than the fifth day of each

month, Supplier will deliver to Tesla a copy of all Tesla Data in its possession or control in the form and format requested by Tesla.

## 7. INTELLECTUAL PROPERTY RIGHTS

**7.1** Tesla Material. "*Tesla Material*" means all information systems and technology, software, documentation, prototypes, tools, methods, forms, processes, workflows, data, compilations, designs, manuals, specifications and other material owned, licensed to, or developed by Tesla (or its Affiliates) that is made available to Supplier Personnel for use in rendering the Services. Subject to any limitations or restrictions set forth in agreements between Tesla (or its Affiliate) and third party licensors of Tesla Material, Tesla grants Supplier a limited, nonexclusive, non-transferable, no-charge license during the Term to Use the Tesla Material in location(s) approved by Tesla for the sole purpose of providing the Services. When Tesla Material is no longer required for performance of the Services, or in any event upon expiration or termination of the applicable Agreement, Supplier will return it to Tesla in an agreed format or, at Tesla's election, destroy it and certify the destruction of all copies in Supplier's (and any Subcontractor's) possession or control.

**7.2** Developed Material. Subject to Section 7.3, Tesla will own all Intellectual Property Rights in and have the sole right to use all Deliverables and other work product created by Supplier Personnel for Tesla under each Agreement (collectively, "*Developed Material*"). Developed Material will be deemed to be works made for hire owned by Tesla upon their creation. To the extent that any such Developed Material is not deemed to be a work made for hire and the property of Tesla by operation of Law, Supplier irrevocably assigns, transfers and conveys to Tesla, without further consideration, all of its right, title and interest (including all Intellectual Property Rights) in and to such Developed Material. Supplier shall execute (and cause its employees to execute) such documents or take such actions as Tesla may reasonably request to perfect Tesla's ownership of Developed Material. Supplier will promptly disclose the creation of Developed Material to Tesla. Tesla grants to Supplier a fully paid-up, royalty-free, nonexclusive license during the Term to Use such Developed Material solely as necessary to perform the Services, and to sublicense Subcontractors involved in rendering the applicable Services during the Term to Use such Developed Material solely as necessary to perform Services on Supplier's behalf.

**7.3** Supplier Material. Tesla's ownership of Developed Material that incorporates any material created and owned by Supplier (or its Subcontractor) outside the performance of Services ("*Supplier Material*") will be subject to Supplier's (or its applicable Subcontractor's) ownership of such Supplier Material. Unless otherwise agreed in a separate written license agreement executed by the Parties, Supplier grants to Tesla (and its Affiliates) a non-exclusive, royalty-free, perpetual, irrevocable, transferable, fully paid-up, world-wide license to Use, sublicense and distribute Supplier Material that is incorporated into any Developed Material or is reasonably required to Use any Developed Material in a cost-effective manner (*e.g.,* tools). Supplier shall obtain Tesla's written approval prior to incorporating any Supplier Material into any Developed Material.

**7.4** Third Party Material. Supplier will not incorporate any third party proprietary materials, information or intellectual property ("*Third Party Material*") into Developed Material, including all Deliverables or other work product to be delivered to Tesla, unless Supplier has obtained for Tesla a perpetual, worldwide, fully paid-up, royalty-free, non-exclusive license permitting Tesla and its Affiliates to use, sublicense and distribute such Third Party Material in the conduct of their normal business operations.

**7.5** Open Source Code. Supplier represents and warrants that it will not incorporate any Open Source Code into a Deliverable or other work product to be delivered to Tesla without Tesla's express, prior written consent.

**7.6** Intellectual Property Rights Agreements with Supplier Personnel. Supplier is responsible for having in place with all Supplier Personnel (either directly or indirectly through their respective employers) such agreements respecting Intellectual Property Rights as are necessary to comply with this Section 7 (Intellectual Property Rights).

**7.7** Licenses and Rights Survive Bankruptcy. All licenses and rights of Use granted under or pursuant to this MSA and each Agreement shall be deemed to be licenses to rights in "intellectual property" for the purposes of Section 365(n) of the United States Bankruptcy Code.

**7.8** No Interference. Nothing in this MSA or any Agreement will be deemed to prevent Supplier from carrying on its business or developing for itself or others materials that are similar to or competitive with those produced as a result of the Services provided they do not contain or disclose any Confidential Information or proprietary information of Tesla or otherwise infringe or constitute a misappropriation of Tesla's Intellectual Property Rights.

**8. TERM AND TERMINATION**

**8.1** <u>Duration</u>. This MSA will come into effect when signed by both Parties and shall remain in effect until terminated under this Section or by mutual written agreement of the Parties. The term of each Agreement will be set forth in the applicable Purchase Order and/or Approved Work Order (such period is the "***Term***").

**8.2** <u>Termination, Generally</u>. This MSA and each Agreement may only be terminated as provided in this Section 8. Termination by a Party will be without prejudice to any other rights and remedies available to a Party. Tesla will not be obliged to pay any termination charges or demobilization fees in connection with the termination of this MSA or of any Agreement.

**8.3** <u>Termination by Tesla</u>. Tesla may terminate this MSA and/or an Agreement as follows: (a) for default without affording Supplier any additional time or opportunity to cure: (i) if Supplier commits a breach of Section 6 (Confidentiality) of this MSA; (ii) as provided in Section 12 (Force Majeure) of this MSA; (iii) if Supplier violates any Tesla Policies of which Supplier has been given notice or applicable Laws; (iv) if Supplier breaches Section 9.4 (Debarment) of this MSA; or (v) if Supplier commits multiple breaches of the Agreement, none of which is necessarily a material breach, but which Tesla determines have had an aggregate effect comparable to that of a material breach; (b) if Supplier has breached any material obligation under the Agreement and does not cure the breach within 15 days after receiving notice of it from Tesla, provided that Supplier will not be afforded any additional time or opportunity to cure if Supplier has previously breached the same material obligation; or (c) for convenience (i.e., without cause) at any time by giving Supplier at least 30 days' prior written notice specifying the terminated Services and designating the termination date and paying the agreed termination charge set forth in the applicable Agreement, if any.

**8.4** <u>Termination by Supplier</u>. If Tesla fails to pay Supplier when due undisputed Charges totaling at least two months' Charges under an Agreement and fails to make such payment within 45 days after the date Tesla receives notice of non-payment from Supplier, Supplier may terminate that Agreement as of a date specified in a written notice of termination referencing this Section and expressly stating Supplier's intent to terminate the Agreement. Supplier may not suspend performance of the Services during the Term for any reason.

**8.5** <u>Operational Transition</u>. Upon termination or expiration of the Agreement, Supplier will deliver to Tesla and/or a subsequent supplier any remaining property of Tesla in Supplier's possession, including reports, data, work product, and Confidential Information (alternatively, as requested by Tesla, Supplier will destroy such property), and certify that all such Tesla property has been removed from Supplier's systems, premises and control and either returned or destroyed. All materials in electronic form shall be delivered to Tesla on such media and in such file format as Tesla may direct.

**9. REPRESENTATIONS AND WARRANTIES OF SUPPLIER**

**9.1** <u>Performance of Services</u>. Supplier represents and warrants that it will perform all Services (i) in accordance with the Agreement; (ii) in a good, professional and workmanlike manner, free from defects in material and workmanship and in accordance with industry standards; (iii) in strict accordance with Supplier's specifications, samples or other descriptions provided to Tesla or approved or adopted by Tesla; (iv) in compliance with all applicable Laws; (v) efficiently and in a cost-effective manner subject to the requirements of the Agreement; and (vi) using qualified personnel with suitable training, education, experience and skill to perform the Services in accordance with timing and other requirements of the Agreement.

**9.2** <u>Non-Infringement</u>. Supplier represents and warrants that: (a) the Services will not infringe or misappropriate any Intellectual Property Rights of any third party; (b) Supplier has all rights and licenses necessary to convey to Tesla the ownership of (or license rights to Use) as required under the Agreement, all Intellectual Property Rights in Deliverables, Developed Materials and other materials provided to Tesla; and (c) no Deliverables or other materials provided to Tesla, nor their use by Tesla will infringe or constitute an infringement or misappropriation of any Intellectual Property Rights of any third party.

**9.3** <u>Malware</u>. Supplier represents and warrants that it will not introduce Malware into Tesla's or any of its Affiliates' systems and that Supplier will exercise Commercially Reasonable Efforts to prevent Malware from being so introduced. If Malware is found to have been introduced into Tesla's or any of its Affiliates' systems as a result of a breach of the foregoing warranty, Supplier will, at no additional charge, assist Tesla in eradicating the Malware and reversing its effects and, if the Malware causes a loss of data or operational efficiency, to assist Tesla in mitigating and reversing such losses.

**9.4** <u>Debarment</u>. At all times throughout the Term, Supplier represents and warrants that it shall not be: (a) debarred, suspended, excluded or disqualified from doing business with the United States Government; or (b) listed

on the Excluded Parties List System maintained by the General Services Administration of the United States Government (found at www.epls.gov); or (c) an entity with which U.S. entities are prohibited from transacting business of the type contemplated by the Agreement or with which U.S. entities must limit their interactions to types approved by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**"), such as by Law, executive order, trade embargo, economic sanction, or lists published by OFAC.  Supplier agrees to immediately notify Tesla in writing in the event Supplier breaches any of its representations and warranties or has reason to believe that it will become in breach of any of such representations and warranties.

## 10. INSURANCE

**10.1** Types of Insurance.  At all times throughout the Term, Seller shall procure and maintain (and shall cause each subcontractor to maintain), at its sole cost and expense, and upon request furnish to Tesla a certificate evidencing the following insurance: (a) commercial general liability insurance with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, as well as contractual liability coverage and naming Tesla as an additional insured; (b) employer's liability insurance with minimum coverage of at least One Million Dollars ($1,000,000); (c) automobile liability insurance on all owned, non-owned and/or hired vehicles with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, and physical damage insurance for the actual cash value of each such vehicle; (d) if applicable, all risk property perils insurance covering the full replacement value of Tesla Property while in Seller's care, custody, or control and naming Tesla as loss payee; and (e) errors and omissions liability insurance covering liability for loss or damage due to an act, error, omission or negligence, with a minimum limit per event of One Million Dollars ($1,000,000).  Seller shall also comply with all applicable workers' compensation and/or other Laws that may accrue in favor of any Seller Personnel in all locales where Seller Personnel perform(s) in connection with the Agreement.

**10.2** Insurance, Generally.  Supplier will be responsible for all deductibles and retentions with regard to its insurance.  In the case of loss or damage or other event that requires notice or other action under the terms of any insurance coverage described above, Supplier will be solely responsible for taking such action.  Supplier will provide Tesla with contemporaneous notice and such other reasonable and relevant information as Tesla may request regarding the event.  The policies shall: (a) be primary and not contributory with any liability coverage carried by Tesla or any Affiliate of Tesla; (b) name Tesla and any other entity reasonably requested by Tesla as additional insureds; (c) provide for severability of interests; (d) provide for waiver of subrogation; (e) be with one or more insurance companies rated A minus or better (as determined by A.M. Best & Company), and licensed to do business in the locations where Services are to be performed; and (f) require the insurer to give Tesla at least 30 days' prior written notice of any restrictive change, non-renewal or cancellation that may affect Tesla's rights thereunder.  Supplier will furnish to Tesla a certificate evidencing such coverage, upon request.

## 11. INDEMNIFICATION

**11.1** Indemnification by Supplier.  Supplier will indemnify, defend and hold harmless Tesla, its Affiliates and their respective officers, directors, employees, agents and representatives (collectively, "***Tesla Indemnitees***"), from any and all losses arising from, in connection with, or based on allegation of any of the following: (a) any Claim by, on behalf of or relating to Supplier Personnel; (b) any Claim that, if true, would constitute a breach of Supplier's obligations under Section 6 (Confidentiality); (c) any Claim that, if true, would arise from or be attributable to a breach of Supplier's obligations under Section 2.7 (Compliance with Laws and Tesla Policies); (d) any Claim that, if true, would arise from or be attributable to a breach of Supplier's obligations under Section 9.2 (Non-Infringement); (e) any Claim for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Tesla and Supplier and their respective subcontractors) caused by the tortious conduct of Supplier, any Supplier Personnel, or any of Supplier's third-party suppliers; and (f) the inaccuracy or untruthfulness of any representation or warranty made by or on behalf of Supplier in the Agreement.

**11.2** Infringement Claims.  If any item used by Supplier to provide the Services becomes, or in Supplier's reasonable opinion is likely to become, the subject of an infringement or misappropriation Claim, Supplier will at its expense, in addition to indemnifying Tesla Indemnitees as provided in this Section 11 (Indemnification) and to the other rights Tesla may have under the Agreement, (i) promptly secure the right to continue using the item, or (ii) if this cannot be accomplished with Commercially Reasonable Efforts, then replace or modify the item to make it non-infringing or without misappropriation; provided, however, that any such replacement or modification may not degrade the performance or quality of the affected components of the Services or disrupt Tesla's business operations, or (iii) if neither of the foregoing can be accomplished by Supplier with Commercially Reasonable Efforts, then upon at least 180 days' prior written notice to Tesla, Supplier may remove the item from the Services, in which case the

Charges will be equitably adjusted to reflect such removal.  If removal of the item from Services causes material loss or degradation of the Services, such loss or degradation will constitute a material breach of the Agreement by Supplier in respect of which Tesla may exercise its termination and other rights and remedies.

**11.3**    Indemnification Procedures.  Tesla will give Supplier prompt written notice of any Claim for which indemnification is sought under this Section 11.  Failure to give notice will not diminish Supplier's obligation under this Section if Supplier has or receives knowledge of the existence of such Claim by any other means or if the failure does not materially prejudice Supplier's ability to defend the Claim.  Supplier may select legal counsel to represent Tesla (said counsel to be reasonably satisfactory to Tesla) and otherwise control the defense of such Claim.  If Supplier elects to control the defense of such Claim, Tesla may participate in the defense at its own expense.  If Supplier, within a reasonable time after receipt of such notice, fails to defend Tesla, Tesla may undertake the defense of, and compromise or settle, the Claim on behalf and at the risk of Supplier.  If the Claim is one that cannot by its nature be defended solely by Supplier, Tesla will make available information and assistance as Supplier may reasonably request at Supplier's expense.  Supplier may not, without the prior written consent of Tesla, (i) consent to the entry of any judgment or enter into any settlement that provides for injunctive or other non-monetary relief affecting any Tesla Indemnitee, or (ii) consent to the entry of any judgment or enter into any settlement unless such judgment or settlement provides for an unconditional and full release of the Tesla Indemnitees and does not diminish any of Tesla's rights under the Agreement or result in additional fees or charges to Tesla.

**12.    LIABILITY**

**12.1**    Limitation of Liability and Exclusions.

(a)    Except as provided in Section 12.1(c) below, each Party's total liability to the other Party in connection with the Agreement, whether in contract or in tort (including for breach of warranty, negligence and strict liability in tort), will be limited as follows:  (i) Supplier's liability to Tesla shall not exceed an amount equal to the greater of one million dollars ($1,000,000 USD) or the Charges paid or payable to Supplier pursuant to the Agreement for proper performance of the Services for the 12 months prior to the month in which the most recent event giving rise to liability occurred; and (ii) Tesla's liability to Supplier shall not exceed an amount equal to the Charges paid or payable to Supplier pursuant to the Agreement for proper performance of the Services.

(b)    Except as provided in Section 12.1(c) below, neither Party will be liable to the other for any consequential, incidental, indirect or punitive damages, or any loss of revenue, business, savings or goodwill, regardless of the form of action or the theory of recovery, even if it has been advised of the possibility of such damages.

(c)    The limitations and exclusions set forth in Sections 12.1 and 12.1(b) will not apply with respect to: (i) damages attributable to intentional torts, unlawful conduct or gross negligence; (ii) Claims that are the subject of indemnification pursuant to Section 11 (Indemnification); (iii) damages attributable to Supplier's breach of its obligations with respect to Tesla Confidential Information; (iv) intentional misappropriation or intentional infringement of a Party's Intellectual Property Rights; or (v) damages attributable to Supplier's wrongful cessation or abandonment of the Services.

(d)    The Parties agree that the following will be considered direct damages:  (i) costs and expenses of recreating or reloading any lost, stolen, corrupted or damaged Tesla Data; (ii) costs and expenses of implementing a work-around in respect of a failure to provide any Services as required by the Agreement; (iii) straight time, overtime and related expenses, including overhead allocations for employees, wages and salaries of additional employees, travel expenses, overtime expenses, telecommunications charges and similar charges, incurred in connection with clauses (i) and (ii) above due to Supplier's failure to perform in accordance with the Agreement; (iv) costs and expenses incurred for Tesla (or its Affiliates) to bring the Services in-house or to contract to obtain services similar to the Services from an alternate source, including the costs and expenses associated with the retention of external consultants and legal counsel to assist with any re-sourcing; (v) damages suffered by any Tesla Affiliate that would be direct damages if they had instead been suffered by Tesla; and (vi) payments, fines, penalties or interest imposed by a governmental body or regulatory entity to the extent caused by Supplier.

**12.2**    "*Force Majeure Event*" means an event beyond the reasonable control of a Party that delays or prevents the Party from performing its obligations under the Agreement, provided that (a) the non-performing Party is without fault in causing or failing to prevent the event, and (b) the event cannot be circumvented through the use of commercially reasonable alternative sources, workaround plans or other means.  The affected Party will promptly notify the other Party of any Force Majeure Event and of its plans and efforts to implement a work-around, in which case the affected Party will be excused from further performance of the affected obligations as long as the Force Majeure Event continues.  The affected Party will continue to use Commercially Reasonable Efforts to perform to the extent possible

and will comply with any applicable disaster recovery obligations.  The affected Party will notify the other Party promptly when the Force Majeure Event has abated.  If a Force Majeure Event prevents performance of the Services under an Agreement or Project for more than thirty consecutive days, then Tesla may terminate the Agreement or Project as of a date specified by Tesla in a written notice of termination to Supplier, in which case Tesla will pay the Charges for all Services actually performed, but will not be liable for payment of any early termination charges or demobilization costs for the terminated Services.

**13.     DISPUTE RESOLUTION**

**13.1**     Informal Dispute Resolution.  In the event any disputes, differences or controversies arise between the Parties, out of or in relation to or in connection with the provisions of this MSA or any Agreement, the Parties shall thoroughly explore all possibilities for an amicable settlement.

**13.2**     Jurisdiction and Venue.

(a)     Any dispute arising out of or relating to an Agreement that is not resolved through negotiation will be settled exclusively by final and binding arbitration conducted in accordance with the then-current Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services/Endispute ("***JAMS***").  The existence, content and result of the arbitration shall be held in confidence by the Parties, their representatives, any other participants, and the arbitrator.  The arbitration will be conducted by a single arbitrator selected by agreement of the Parties or, failing such agreement, appointed in accordance with the JAMS rules.  The arbitrator shall be experienced in agreements for services similar to the Services.  Any demand for arbitration and any counterclaim will specify in reasonable detail the facts and legal grounds forming the basis for the claimant's request for relief and will include a statement of the total amount of damages claimed, if any, and any other remedy sought by the claimant.  The arbitration will be conducted in the English language in Palo Alto, California.  Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in their discretion, award reasonable costs and fees to the prevailing Party.  The arbitrator will have full power and authority to determine issues of arbitrability and to interpret or construe the applicable provisions of the Agreement and to fashion appropriate remedies for breaches thereof (including interim or permanent injunctive relief); provided that the arbitrator will not have any right or authority: (i) in excess of the authority of a court having jurisdiction over the Parties and the dispute would have absent this arbitration agreement; (ii) to award damages in excess of the types and limitation of damages found in the Agreement; or (iii) to modify the terms of the Agreement.  The award of the arbitrator will be issued within thirty (30) days of the completion of the hearing, shall be in writing, and shall state the reasoning on which the award is based.  Judgment upon the award rendered in the arbitration may be entered in any court of competent jurisdiction.  Each Party will have the right to apply at any time to a judicial authority for appropriate injunctive relief (or other interim or conservatory measures), and by doing so will not be deemed to have breached its agreement to arbitrate or to have impaired the powers reserved to the arbitrator.

(b)     Subject to Section 13.2(a), for any litigation arising out of or relating to this MSA or an Agreement, regardless of the form of action or the Party that initiates it, the Parties irrevocably and unconditionally submit to the exclusive jurisdiction of and venue in the United States District Court for the Northern District of California or, if that court does not have jurisdiction, the Superior Court of the State of California, County of Santa Clara.  The Parties irrevocably and unconditionally waive any objection to the laying of venue in such courts.  The Parties further consent to the jurisdiction of any state or federal court with subject matter jurisdiction located within a district that encompasses assets of a Party against whom a judgment (or award) has been rendered for the enforcement of the judgment (or award) against the assets of such Party.

**14.     MISCELLANEOUS**

**14.1**     Waiver.  No failure or delay by a Party in exercising any right, power or remedy will operate as a waiver of that right, power or remedy, and no waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party.  If a Party waives any right, power or remedy, the waiver will not waive any successive or other right, power or remedy that Party may have.

**14.2**     Remedies Cumulative.  All remedies provided in the Agreement are cumulative and in addition to and not in lieu of any other remedies available to a Party under the Agreement, at law, or in equity.

**14.3**     Assignment.  Supplier may not assign, transfer or otherwise convey or delegate any of its rights or duties under the Agreement to any other Party (except to the successor in a merger or acquisition of Supplier) without the prior written consent of Tesla, and any attempt to do so will be void.  The Agreement shall be binding upon the respective successors and permitted assigns of the Parties.

**14.4** <u>Governing Law</u>.  This MSA and each Agreement will be interpreted and construed in accordance with the substantive laws of California and the United States generally applicable therein, without regard to any provisions of its choice of law rules that would result in a different outcome.

**14.5** <u>Audits and Records</u>.  During business hours and upon reasonable advance notice, Tesla and its agents may inspect, examine and audit the records and data of Supplier (and its subcontractors) that pertain to the Services to verify (a) the accuracy of Supplier's invoices, and (b) Supplier's compliance with the Agreement.  In support of the foregoing right, Supplier will keep and maintain (i) financial records relating to the Agreement in accordance with generally accepted accounting principles, (ii) records substantiating Supplier's invoices, (iii) records pertaining to Supplier's compliance with the Agreement, and (iv) such other operational records pertaining to performance of the Services as Supplier keeps in the ordinary course of its business.  Supplier will retain such records for the longer of three (3) years after the Term ends or as required by applicable Laws.  Supplier will make such records available to Tesla and its auditors for examination and copying upon request.

**14.6** <u>Notices</u>.  All formal notices, requests, demands, approvals and communications under this MSA and each Agreement (other than routine operational communications) (collectively, "***Notices***") will be in writing and may be served either (i) in person or (ii) by registered or certified mail with proof of delivery, addressed to the Party at the addresses set forth below.  Notices given as described in the preceding sentence will be considered received on the day of actual delivery.  A Party may change its address or designee for notification purposes by giving the other Party prior written notice of the new address or designee in the manner provided above.  The Parties may mutually agree that certain types of routine approvals and notices of a non-legal nature may be given by electronic mail.

| In the case of Tesla:<br>Tesla, Inc.<br>3500 Deer Creek Road, Palo Alto, CA 94304<br>Attn: _____ | With a copy to:<br>Tesla, Inc.<br>3500 Deer Creek Road, Palo Alto, CA 94304<br>Attn:  Legal Department |
|---|---|
| In the case of Supplier:<br>Belcan Services Group, Ltd. Partnership<br>10200 Anderson Way<br>Cincinnati, OH  45242<br>Attn:  Tara Hunt | (Note:  If no information is listed here for Supplier, notices shall be sent to the attention of the Supplier representative who signs this MSA.) |

**14.7** <u>Interpretation</u>.  Section references are to sections of the document in which the reference is contained and will be deemed to refer to and include all subsections of the referenced section.  The section headings in this MSA are for reference purposes only and may not be construed to modify or restrict any of the terms of the Agreement.  This MSA and each Agreement will be deemed to have been written by both Parties.  This MSA is written in the English language, and the English text of this MSA and of each Agreement shall prevail over any translation hereof.  Unless the context requires otherwise, (i) "including" (and any of its derivative forms) means including but not limited to, (ii) "may" means has the right, but not the obligation to do something and "may not" means does not have the right to do something, and (iii) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation.

**14.8** <u>Order of Precedence</u>.  In the event of a conflict between or among the documents comprising an Agreement, the following order of precedence will apply (documents listed in descending order of priority): this MSA; NDA; the Approved Work Order; and other schedules.  Notwithstanding the foregoing, an Approved Work Order may amend or override this MSA if and to the extent that the Approved Work Order specifically identifies the affected provision(s) of the MSA and expressly states that the Parties intend to amend or override such provision(s) for purposes of that Agreement.

**14.9** <u>Severability</u>.  If any provision of an Agreement Document is held invalid by a court with jurisdiction over the Parties, such provision will be severed and the remainder of the Agreement Documents will remain in full force and effect.

**14.10** <u>Third Party Beneficiaries</u>.  This MSA and each Agreement is entered into solely between Supplier and Tesla and/or its Affiliate and, except for the Parties' indemnification obligations under Section 11 (Indemnification) and the Service Recipients, will not be deemed to create any rights in, or any obligations to, any third parties.

**14.11** <u>Survival</u>.  Any provision of the Agreement that contemplates or governs performance or observance subsequent to termination or expiration thereof will survive the expiration or termination thereof for any reason,

including the following Sections: 6 (Confidentiality), 7 (Intellectual Property Rights), 9 (Representations and Warranties of Supplier), 11 (Indemnification), 12 (Liability), and 14.5 (Audits and Records).

**14.12**  Entire Agreement.  The Agreement, including all Agreement Documents, constitutes the entire agreement between the Parties with respect to its subject matter and merges, integrates and supersedes all prior and contemporaneous agreements and understandings between the Parties, whether written or oral, concerning its subject matter.  Any terms and conditions on any order or written notification from either Party that purport to vary or supplement the Agreement shall not be effective or binding on the other Party.  This MSA and any Agreement may be amended or modified solely in a writing signed by a duly authorized representative of each Party.

**14.13**  Defined Terms.  Terms used in this MSA or in an Agreement with initial capitalization have the meanings specified where used or in this Section 14.13.

(a)  *"Affiliate"* means with respect to an entity, any other entity or person controlling, controlled by, or under common control with, such entity.  For purposes of this definition, "control" means possessing, directly or indirectly, the power to direct or cause the direction of the management, policies or operations of an entity, whether through ownership of voting securities, by contract or otherwise.

(b)  *"Agreement Documents"* means this MSA, the applicable Approved Work Order and Purchase Order, documents referenced in any of the foregoing, and any other additional written agreements which pertain to the Services and are signed by authorized representatives of both Parties.

(c)  *"Anti-Bribery Laws"* means the United States Foreign Corrupt Practices Act of 1977, the United Kingdom Bribery Act of 2010, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (in each case, as amended from time to time) and all other applicable national, regional, provincial, state, municipal or local laws and regulations that prohibit the bribery of, or the providing of unlawful gratuities, facilitation payments or other benefits to, any government official or any other person.

(d)  *"Change"* means any material change to the scope of, Charges for, or other contractual commitments of a Party with respect to, the Services being provided by Supplier.

(e)  *"Change Order"* means a mutually agreed Change to the scope, timing, manner or cost of performing the Services pursuant to an Agreement.  A change order may not modify the terms of this MSA.

(f)  *"Claim"* means any demand, or any civil, criminal, administrative or investigative claim, action or proceeding (include arbitration) asserted, commenced or threatened against an entity or person by an unaffiliated third party.  For the purposes of this definition, an employee of either Party is considered an unaffiliated third party.

(g)  *"Commercially Reasonable Efforts"* means taking all such steps and performing in such a manner as a well managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit.

(h)  *"Deliverable"* means any work product identified as a 'Deliverable' in writing by the Parties.

(i)  *"Effective Date"* has the meaning given in the Agreement.

(j)  *"Intellectual Property Rights"* means all (i) patents, patent applications, patent disclosures and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, Internet domain names, and registrations and applications for the registration for any of them, together with all goodwill associated with any of them, (iii) copyrights and copyrightable works (including computer programs and mask works) and registrations and applications for registration, (iv) trade secrets, know-how and other confidential information, (v) waivable or assignable rights of publicity, waivable or assignable moral rights, (vi) unregistered and registered design rights and any applications for registration, and (vii) database rights and all other forms of intellectual property, such as data.

(k)  *"Law(s)"* means any statute, regulation, ordinance, rule, order, decree or governmental requirement enacted, promulgated or imposed by any governmental authority at any level (*e.g.,* municipal, county, province, state or national).  For clarity, "Law(s)" includes all Anti-Bribery Laws.

(l)  *"Malware"* means program code or programming instruction(s) or set(s) of instructions intentionally designed to disrupt, disable, harm, interfere with or otherwise adversely affect computer programs, data files or operations, or other code typically described as a virus, Trojan horse, worm, back door or other type of harmful code.

(m)     "*Open Source Code*" means software that requires as a condition of its use, modification or distribution, that it be disclosed or distributed in source code form or made available at no charge, including, without limitation, software licensed under the GNU General Public License (GPL) or the GNU Lesser/Library GPL.

(n)     "*Party*" means either Tesla or Supplier, as required by the context.

(o)     "*Productive Hour*" means an hour of productive work by Supplier Personnel in performing Services (excluding breaks, travel time, idle time, sick time, vacation, etc.).  Time spent on the following activities does not constitute Productive Hours and will not be billed to Tesla: (i) travel time to and from the work site for the performance of the Services, unless expressly authorized by Tesla in writing; (ii) vacation time, holidays, sick leave and other forms of personal leave; (iii) time spent on Supplier administrative matters; (iv) time spent on marketing and sales activities, including preparation of proposals to Tesla; (v) time spent on negotiation of Agreement Documents; and (vi) time spent attending courses, seminars and Supplier meetings not related to the Services.

(p)     "*Project*" means a group of related functions or activities that spans multiple days, weeks, or months and builds cumulatively toward the achievement of defined target outcomes or objectives.  A Project typically has multiple phases or life-cycle stages and involves written project plans with defined interim milestones and deliverables to measure progress toward the achievement of its target outcomes or objectives.  The Services provided for each Tesla Facility will be deemed a separate Project for purposes of the Agreement.

(q)     "*Service Level*" means a standard of performance with respect to the Services.

(r)     "*Service Level Credit*" means a monetary credit potentially payable to Tesla in respect of a Service Level Default.

(s)     "*Service Level Default*" means a failure of Supplier to meet a Service Level during the applicable measurement period, provided that the failure is not excused pursuant to Sections 5.2 (Savings Clause) or 12.2 (Force Majeure).  Service Level Credits will not be construed as a penalty or as liquidated damages for a Service Level Default and, accordingly, they will not be deemed to constitute Tesla's remedy, exclusive or otherwise, for any damages caused by a Service Level Default.  Supplier irrevocably waives any claim or defense that Service Level Credits are not enforceable or that they constitute a sole and exclusive remedy of Tesla with respect to a Service Level Default.

(t)     "*Service-Related Taxes*" means, for each Project, transactional taxes in respect of the Services that Supplier is legally responsible to collect and remit to the applicable taxing authorities and for which Tesla is responsible for paying or reimbursing Supplier, and does not include any taxes that are assessed on any goods or services used or consumed by Supplier (or its Subcontractors) in providing the Services where the tax is imposed on Supplier's (or its Subcontractor's) acquisition or use of the goods or services in its provision of the Services.

(u)     "*Supplier Personnel*" means any personnel furnished by Supplier to perform any part of the Services, including employees and independent contractors of Supplier, its Affiliates and subcontractors.

(v)     "*Tesla Data*" means all data and information regarding Tesla, its customers and suppliers that is either: (i) furnished, disclosed or otherwise made available to Supplier Personnel, directly or indirectly, by or on behalf of Tesla pursuant to an Agreement; or (ii) collected or created by Supplier Personnel on behalf of Tesla in the course of performing the Services.  Tesla Data will be deemed to be Confidential Information that is subject to the NDA.

(w)     "*Tesla Facility*" means, collectively, the Tesla facility or real property at which Supplier will perform Services and the reasonable office space, furniture, fixtures, equipment, hardware, software, telephones, office supplies, and other facility resources to be provided or made available by Tesla to Supplier Personnel who are assigned by Supplier to work on Tesla premises by mutual agreement of the Parties, as evidenced in the applicable Agreement.

(x)     "*Use*" means the right to use, execute, display, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of software or other copyrighted or copyrightable works.

(y)     "*Work Order*" means the form of document that will be used to authorize Supplier to perform Services by mutual agreement of the Parties.  When duly executed by the authorized representatives of both Parties, a Work Order becomes an "*Approved Work Order*."

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this MSA as of the date signed below by Tesla.

| Tesla, Inc. | Supplier |
|---|---|
| By: *Matthew Burkholder (Aug 10, 2020 14:55 CDT)* | By: *Tara Hunt* |
| Printed: Matthew Burkholder | Printed: Tara Hunt |
| Title: Director | Title: Regional Sales Director |
| Date: Aug 10, 2020 | Date: 07/15/2020 |
| | Company: Belcan Services Group, Ltd. Partnership |
| | Address: 10200 Anderson Way, Cincinnati, OH  45242 |

## SCHEDULE A

## APPROVED WORK ORDER NO. __ FOR SERVICES

**1.     Introduction.**  This Work Order ("**Work Order**") is issued under and pursuant to the Master Services Agreement by and between Tesla, Inc. ("**Tesla**") and Supplier.  Capitalized terms used but not defined in this Work Order will have the meanings given them in the MSA.  The Term of this Work Order shall be from  7/15/2020   **[***date***]** (the "***Effective Date***") through   7/15/2022    **[***date***]**.

**2.     Services and Performance Measurement.**

(a)     With reference to Section 1 (Services) of the MSA, Supplier will perform the following Services pursuant to this Work Order **[***describe services, any required resources, any Deliverables, and any deadlines or milestones***]**: ___

(b)     With reference to Section 2.4 (Performance Criteria) of the MSA, Supplier will perform the Services in accordance with the following Service Levels (if any), and Supplier will credit or pay Tesla the corresponding Service Level Credit for each Service Level Default **[***define metrics applicable to services and list any credits payable for failure to achieve each metric***]**: _____

**3.     Acceptance Tests**.  With reference to Section 2.5 (Acceptance Tests) of the MSA, the Services must pass the following acceptance tests (if any): _____

**4.     Charges.**  With reference to Section 4 (Charges) of the MSA, Tesla will pay Supplier for performance of the Services under this Work Order as follows *(e.g., fixed price, time and materials, and any deadlines or milestones*):

**5.     Additional Services.**  Tesla may request additional services after the Effective Date.  Unless otherwise agreed by the Parties in writing, the fees for such services will be calculated by multiplying the Productive Hours by the applicable agreed billing rates set forth in the Supplier Rate Card.  **[***Supplier to provide resource rate card***].**

**6.     Facilities.**  With reference to Section 2.2 (Manner of Performance) of the MSA and if applicable, Supplier will perform the Services under this Work Order at or from the following facilities: _____

**7.     Key Supplier Positions.**  With reference to Section 3.2 (Key Supplier Positions) of the MSA, the Key Supplier Positions for purposes of this Work Order, if any, are: _____

**8.     Service-Specific Terms.**  Annex 1 (Additional Service Terms) hereto set forth additional terms and conditions which may apply for purposes of this Work Order, if and to the extent applicable to the Services to be performed hereunder.

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this Approved Work Order as of the date last entered below.

| **Tesla Entity**:_____ | **Supplier** |
|---|---|
| By:_____ | By:_____ |
| Printed:_____ | Printed:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |
| | Company:_____ |
| | Address:_____ |

## ANNEX 1 – ADDITIONAL SERVICE TERMS

This Annex 1 sets forth additional terms that are incorporated by reference into the Agreement, if and to the extent applicable to Supplier's performance of, and/or Tesla's purchase of, the Services described therein.

**1.    Consulting Services.**  With reference to Sections 6.1 (Confidentiality) and 7.3 (Supplier Material) of the MSA, no information (such as specifications, drawings, sketches, models, samples, tools, computer or other apparatus programs, technical or business information or data, written, oral or otherwise) furnished by Supplier to Tesla under the Agreement shall be considered to be confidential or proprietary to Supplier; provided, however, that the foregoing shall not apply with respect to any third party IT or Network Security OEM product or related service specification or product sample that is, prior to disclosure to Tesla, (a) approved in advance and in writing by Tesla's IT Department, and (b) provided to Tesla's IT Department and expressly identified by Supplier as such.

**2.    Facilities Services.**

**2.1**    Responsibility for Supplying Certain Resources.  With reference to Section 2.3 of the MSA and except as otherwise expressly provided in the Agreement, Supplier will be responsible at its expense for: (a) connecting to utility services at the Tesla Facility as required for the Services, which may include provision of required wiring, piping, valves, bus plugs, transformers, meters, disconnect switches, temporary feeders, power and lighting outlets, and other connections, and disconnecting from such utility services after completing the Services; and (b) providing and maintaining all temporary facilities and utilities required for the Services and, subject to Section 2.2(b) of this Annex 1 with respect to improvements, removing such facilities and utilities after completing the Services, including (i) temporary construction roads and ramps, (ii) main ladders and runways, (iii) temporary light and power (e.g., via portable generator), (iv) weather and heat protection for all such equipment and work areas (e.g., temporary walls, partitions, or protective coverings), and (v) temporary heating equipment, including fuel.  Any power and lighting system must produce 120-volt power, have at least two weatherproof sockets (one for 150-watt lamp and one for 150-watt power extension or additional lamp), produce adequate light, and be installed so as not to interfere with operations of the Tesla Facility.  Any temporary welder power hookups must conform to the requirements of the National Electric Code, Articles 305 and 364-6.

**2.2**    Access to and Use of Tesla Facilities.

(a)    Subject to Supplier's obligations herein and to any applicable legal restrictions, Tesla will manage and maintain the following at the Tesla Facility, as applicable: building and property electrical systems, water, sewer, lights, heating, ventilation and air conditioning ("**HVAC**") systems, physical security services and general custodial/ landscape services (including monitoring and maintaining the uninterruptible power supply ("**UPS**") system).  Supplier shall be responsible for providing all other facilities and support required for the Services.

(b)    Supplier will use the Tesla Facilities in an efficient manner and for the sole purpose of providing the Services.  Supplier will permit Tesla and its agents and representatives to enter into those portions of Tesla premises that are occupied by Supplier Personnel at any time, and to inspect any and all equipment and materials such as construction job boxes, storage containers and trucks.  Supplier shall not use hazardous materials at the Tesla Facility except as required for performance of the Services expressly described in the Agreement and in compliance with applicable Laws.  Supplier will be responsible for any damage to the Tesla Facilities caused by Supplier Personnel (including damage to any and all utility lines).  Supplier shall not make improvements or changes involving structural, mechanical, or electrical alterations to the Tesla Facility without Tesla's prior written consent, which Tesla may withhold in its sole discretion.  At Tesla's option, any improvements to the Tesla Facility shall become the property of Tesla and Seller shall execute such documentation as Tesla reasonably requires to perfect Tesla's ownership thereof. If Tesla does not elect to take title thereto Supplier shall remove the same at the end of the use of the Tesla Facility and shall repair any damage caused by such installation and removal.  Supplier has made itself familiar with the Tesla Facility and assumes all risks and hazards encountered in accessing and using such Tesla Facility.  Except as expressly set forth in the Agreement, Supplier hereby releases Tesla of all liability related to accessing and using the Tesla Facility.

(c)    As a continuing condition of Supplier's use of and access to the Tesla Facility, Supplier shall ensure that no third party obtains any lien or other right in the Tesla Facility and hereby waives and relinquishes, and agrees to obtain from any third parties who might claim any such lien (including without limitation mechanic's liens) or right a written waiver and relinquishment of all rights, if any, to any lien, right, or remedy with respect to the Tesla Facility.  The provisions of this Section 2.2(c) are a bargained-for consideration essential to the Agreement.

**2.3**    Insurance.  Supplier shall obtain and maintain at its own cost and expense (and cause each subcontractor to maintain) policies for the following insurance coverages in accordance with Section 10.1 of the MSA, if and to the

extent applicable to the Services: (a) if the Services include remediation of or exposure to hazardous materials (e.g., asbestos-containing materials, contaminated soil, etc.), contractor's pollution liability with minimum coverage of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate for bodily injury, personal injury and property damage; and (b) if the Services involve use of a helicopter or other aircraft, aviation liability insurance with minimum coverage of at least Five Million Dollars ($5,000,000) per occurrence.

3. **Information Technology Services.**

3.1   Access to Tesla Systems and Facilities.  With reference to Section 5.3 of the MSA, each employee, agent or Subcontractor of Supplier having access to Tesla Systems shall: (a) be assigned a separate User ID by Supplier and only use that ID when logging on to the Systems; (b) log off the Systems immediately upon completion of each session of service; (c) not allows unauthorized individuals to access the Systems; (d) keep strictly confidential the User ID and password and all other information that enables such access; (e) not reuse a compromised password (e.g., a password that has become known to anyone else at any time, including in an emergency); (f) only utilize such access to the Systems to perform his or her obligations to Tesla; (g) comply with Tesla's encryption requirements or other service policies instituted by Tesla from time to time; (h) not perform any unauthorized exploring or mining of the Systems; and (i) only have access to the portion of the Systems necessary to perform Supplier's obligations.

3.2   Supplier Audits.  Supplier will conduct its own Audits pertaining to the Services consistent with the audit practices of well managed companies that perform services similar to the Services.  If applicable, Supplier will perform a security Audit at least annually and will cause a SSAE 16 SOC 1 Type II audit (or equivalent audit) ("**SSAE 16 Audit**") to be conducted annually for each shared services facility at or from which Services are provided.  The SSAE 16 Audit will be conducted in accordance with Tesla's control requirements as communicated by Tesla.  Supplier will permit Tesla to participate in the planning of each SSAE 16 Audit, will confer with Tesla as to the scope and timing of the Audit and will accommodate Tesla requirements and concerns to the extent practicable.  Each SSAE 16 Audit will be scheduled so as to facilitate annual compliance reporting by Tesla and the Service Recipients under the Sarbanes-Oxley Act of 2002 and any regulations promulgated under it.  Supplier will provide Tesla and its independent Auditors with a summary of the SSAE 16 Audit Findings as soon as reasonably possible, and in any event within thirty (30) days after completion of the Audit report.  To the extent the resulting Audit report reveals an actual or potential adverse effect on Tesla and/or the Service Recipients, Supplier will correct any errors or problems identified in the Audit report as soon as reasonably possible.

3.3   Deliverables and Related Documentation.

(a)   Supplier warrants that each Deliverable will not, from the time of delivery to Tesla through the period ending one year after Tesla's final acceptance of the Deliverable, deviate in any material respect from the specifications for such Deliverable set forth or referred to in the applicable Agreement.  If the Deliverable is or becomes part of a System or environment for which Supplier has ongoing maintenance and support responsibility, Supplier's maintenance and support obligations for such System or environment will include providing maintenance and support for the Deliverable.  If Tesla notifies Supplier of a breach of this warranty, Supplier will promptly correct and redeliver the affected Deliverable at no additional charge to Tesla within a reasonable period of time, and in any event in accordance with any applicable time period specified in the applicable Agreement.

(b)   Supplier warrants that any Software or system documentation developed for Tesla by or on behalf of Supplier will (i) accurately and with reasonable comprehensiveness describe the operation, functionality and use of the Software or system, and (ii) accurately describe in terms understandable to a typical system user the functions and features of the Software or system and the procedures for exercising such functions and features.  If Tesla notifies Supplier of a breach of this warranty within the applicable warranty period, Supplier will correct and redeliver the affected documentation at no additional charge to Tesla within a reasonable period of time, and in any event within thirty (30) days after receiving Tesla's notice.

(c)   Supplier warrants that any Deliverables and other components of the Services that are intended to interact or otherwise work together as part of a functioning system as indicated in their specifications or the applicable Agreement under which they are to be produced, will be compatible and will properly inter-operate and work together as components of an integrated system.